I'm Don Bergers, and I have the privilege to represent Mr. Coleman. Your Honor, Mr. Coleman may actually be an innocent man. He's before you today because he was thwarted in proving that, because the government negligently or perhaps deliberately withheld necessary disclosures to allow him to prepare for trial, and because a rogue juror sabotaged deliberations in this case. This case involves virtually all the protections guaranteed to criminal defendants by the Fifth and Sixth Amendments. There's been extensive briefing, there's a lengthy trial record, there are huge excerpts of records, so I'm not obviously going to be able to disclose everything to you linearly without sounding like a tobacco auctioneer. So what I'd like to do is just hit on the main points that I think really deserve the Court's consideration, and perhaps were not thoroughly or are not explained in the briefs. I want to turn first to the due process violation, which I consider to be a very significant error here, because obviously what we have to do is see if we have enough confidence in this verdict before we can uphold it. First of all, let me say that the legal standards that are before the Court, realistically for a Rule 16 violation and a constitutional violation, may very well be the same. A Rule 16 violation warrants reversal if one can prove deprivation of a substantial right. The constitutional violations obviously are substantial rights. The question is only one of prejudice, and I admit that the prejudice here was ample. I'd like to give the Court a brief synopsis of the timeline here, because I think that that really explains everything that happened. The declarations are quite lengthy, and they may perhaps be confusing if one was not actually there. What happened in this case is, is that for two years during pretrial preparation, both the defense and the prosecution purported to rely on a single expert. Ms. Hofsass, whose testimony would not have inculpated the defendant, may have tended to exculpate him. She indicated that there was no gunshot residue in this case. Right on the eve of trial, the government decided, apparently having for the first time reviewed Ms. Hofsass's submissions because they didn't find a lot of discovery that they disclosed belatedly to the defense, including the specifics of her swabbing techniques, that Ms. Hofsass's testimony was insufficient. And then there developed a series of disclosures which were at best sloppy and at worst intentionally deprived the defendant of due process. The timeline as I have it is as follows. On the 28th of May, just before trial, about two months, three months before trial, there's a stipulation entered in which the sole discussion is of Hofsass. A month later, the government first mentions they're going to send these test results out for Mr. Dowell to go and reevaluate. Mr. Dowell conducts the test results during a period of time which, as of the May stipulation, the government knew was reserved for the defense expert's vacation. There could have been no better opportunity crafted to deprive the defense expert of an opportunity to observe these tests. When the defense expert gets back from his vacation, the government still waits several weeks before disclosing even a skeletal amount of information from Mr. Dowell's tests. Then it discloses illegible copies of Mr. Dowell's tests, and finally discloses legible copies of Mr. Dowell's reports on the 23rd of July. Only two or three weeks before trial is set to begin after the defense has pleaded for a continuance, about a month before trial actually began. Defense counsel almost immediately moved to secure funding for the defense expert to do his own testing. The continuance was requested at that point. The continuance was requested at that end, July 23rd, and was given until August 12th and then August 26th. A continuance beyond that would have been fruitless. What the defense did do is they attempted to move for sanctions in order to exclude Mr. Dowell's belated testimony. Once they were saddled with the Hobson's choice of having to go forward with a trial, perhaps without another core defense witness, or to have a continuance, defense counsel chose to go forward with trial. It's a Hobson's choice because the government didn't disclose the necessary information to allow the defense meaningfully to prepare. They sat on their file for at least two years without looking at it, without apparently realizing for themselves that they had a bad case and needed to make it better. Then they attempted to make it better in precisely a way that would hamper the defense in preparing their own defense. But once you get past that, I mean, the remedy for that is for the defense to have an opportunity to respond or to take whatever measures it takes to – basically, I understand what you wanted was an expert for the prosecution who helped your case. But the prosecution realized that before you got to trial, that its expert helped you. So that's your – that's pretty much what you're arguing, that the prosecution should have been stuck with an expert who helped you. And I'm not sure that that's something you're constitutionally entitled to. No, I'm sure we're not constitutionally entitled to that. However, we are entitled to have the prosecutor obey the Constitution and the discovery rules if they want to move on from their bad position. And they didn't do that. But the court doesn't have to – I mean, doesn't have to prohibit the prosecution from using that evidence if the court gives the defense an opportunity to prepare to respond to that. Well, the court didn't. The defendant asked for a continuance, and the court granted them only until August 12th. Then apparently grudgingly granted them until August 26th. The record is very clear the court would have granted no further continuance. Okay. And so why was that insufficient, the time that was granted? Why was that insufficient? Well, the time was insufficient because of the realities of trial practice and what actually happened. The government dawdled in its disclosures even of Mr. Dowell's testing for a number of weeks. They provided a skeletal report in late June. They provided what they themselves admit are illegible copies in July. On July 23rd, by their own admission, this is the government's declaration, they provided, quote, legible copies. We're less than a month before trial. Now, it's taken the government approximately two months to get this information to the defense. The defense only has a month to get it stuck together. Defense counsel gets a letter from her expert that very day. I mean, obviously, a one-day turnaround. This is what I need to do in order to go and go forward. Defense counsel writes a CJA 21 request to the court. There's a rule that says she can't go forward, and I'm sure the expert would not have gone forward without funding. This is an expert who's quite expensive, has to do expensive lab analysis at an independent laboratory. She gets that request in on the 3rd of September. The judge sits on that request for another 10 days – I'm sorry, the 3rd of August. The judge sits on that request for another 10 days before granting it. We're now on August 13th, two weeks before the drop-dead date to start the trial. The defense expert immediately goes and arranges to test-fire this gun. He does two test-firings involving four SAM samples. It takes at least overnight, perhaps more, for each of those SAM samples to be sampled in a meaningful way. He gets the first test – he gets the test out on the 21st because he has to coordinate with Ms. Hofsass. That's the government's problem. I mean, they want him to come down to their range, and Ms. Hofsass is going to be present. It's the gun is in the custody of San Francisco police. He does the test results on the 21st of August. Five or six days later, he gets his first test results. That's much more timely than the government did it. He is constantly, even as the trial is going on, trying to get more test results. And the problem is, is that the test result he has, which practically proves Mr. Coleman to be innocent, simply couldn't be obtained until after the jury was delivered. Well, Counselor, here's the question I have. If the defense was aware that the prosecution was getting a different expert, why did they have to wait for the results in order to – if the test – I mean, if the gun was there to be tested, why couldn't the defense expert go ahead and do whatever tests needed to be done without waiting for the prosecution results? I don't understand why you had to wait for the prosecution's results in order for the defense expert to do additional testing. Well, there was no need to have the defense expert test fire the weapon, because the defense expert told everybody that the evidence exculpated the defendant. It was not until Mr. Dowell came forward with his report that there was any need for the defense expert to come forward and testify and do more tests. In fact, if you look at the record, the defense expert first notifies defense counsel that he is troubled by the results enough to require new testing on the 23rd of July. That's when the defense expert feels that there's a trigger for his own expertise to be employed. Before then, he was working on a record that indicated that there was no evidence of gunshot residue. There's no reason for the defense expert, having seen that there's an absence of inculpatory evidence, to have to himself prove that there's an absence of inculpatory evidence. It wasn't until the government's expert belatedly came forward with the material. And what date was that, that defense first became aware that there was a new expert who, without getting the report, I mean, without having a legible copy, I mean, at some point the defense knew that there's something up. At what point was that, when the defense was aware that there was a new expert and there probably was going to be inculpatory evidence? Well, it certainly isn't before July 9th, because none of it is discussed in the sanctions motions by either party, realistically. It's apparently at the sanctions hearing and then the day after that they start talking about the fact that Dowell is going to be hard on the defense. The report is actually given to the defense. I can't. I think it's around July 16th by the government's declaration that there are illegible copies. The legible copies come a week later. Now, why the government would wait to go and send legible copies of the reports for another week is just beyond me. Obviously, the defense lawyer claimed that there were illegible copies within minutes, I'm sure, because they were just sent. The defense expert was complaining as of the 23rd of July that he lacked any legible copies and he, in his letter, wants the defense lawyer to go and get the legible copies. I mean, there of course the defense has to prepare for trial. The defense has to take affirmative steps. But realistically, what more could have been done? So is it your position that no additional continuance was requested because it was thought that it would be futile? Well, I think the Court made it very clear in its order for the continuance that it was going to go no further than August 12th, and then there's colloquy at the beginning of the transcript that apparently the Court found it convenient to go until August 26th. There was absolutely no way in which this Court was going to go further with it. Well, but if a record would have been made on the day of trial or, you know, a calendar call or something that we're still not ready, can we have an additional continuance? And the judge had said no. That would have been a clearer record in terms of whether or not a continuance was possible. Perhaps it would have been a clearer record, but the record now is clear  You have government misconduct leading to very belated discovery of defense, protests over and over and over again that the defense isn't ready, requests for sanctions to exclude the evidence for which the defense wasn't ready, exploitation by the government of the fact that the defense wasn't ready, and then at the end, after it's too late, proof that the defendant is probably innocent. I mean, you know, the prosecution made hay of the fact that there was test firing which was then immediately analyzed, and that the real problem here is that this test was in the works, and the prosecution knew it, and yet the defense was forced to go forward and have the matter submitted to the jury without meaningful test results. Now, what you say is the proof that the defendant was probably innocent? That after several hours of wearing the shirt that he wore after he test-fired it, Mr. Barrett analyzed the shirt and found that it still contained numerous quantities of particular unique particles. In other words, he did a first test in which he fired the gun. There were, according to Dowell, there were just a couple of unique particles, more than Hofstra's, but just a couple of unique particles. Barrett fires the gun. There are tons of unique particles on it. The prosecution says, but that shirt was never let to stand in the atmosphere. There was no squiggling and wiggling of the hands. It was the different shirt. I mean, this is a shirt, not the shirt that was on the night in question. This is a different shirt. It is a different shirt, but obviously it was the same material. I can see that I'm using up a lot of time, so I want to make sure, and I was afraid of this when we got the argument, but let me make sure I let the Court understand this. Test-firing by Barnett is of one shirt, obviously not Mr. Coleman's shirt. That shirt is immediately taken off for analysis. The government faults that analysis by saying that, no, you have to let the shirt be in the atmosphere for a period of time. The defense lawyer in Barnett says, no, the shirt is being – that shirt was tested and that's being analyzed and we'll have the results shortly. But unfortunately, those results don't come in until after the jury reaches its verdict. Those results, the results under circumstances which, according to every question asked by the government, duplicate the circumstances at issue, show that any person who fired a gun under those circumstances would have had a ton of particles on him, and there are – and that result never gets before the jury. And that shirt does have a ton of particles on it, not Mr. Coleman's shirt, which had only a few unique and distinctive particles on it. So my submission is, is that this verdict is the result of sandbagging the defense to which the defense objected, and it's the sandbagging that the defense has to object to in order to have this Court grant relief. It doesn't really necessarily require that the continuance be denied, although I submit the continuance would have been denied. And we have a fallback argument on ineffective assistance in case the Court is dissatisfied even with that. The objectionable conduct here is the government's discovery violation, and nothing more could have been done to preserve the record on that. No counsel has to be put into a difficult position of going forward with a possibly ephemeral witness missing because a continuance was granted or going forward without their expert. But I don't think we even have to reach it. There was a motion made to sanction the government for discovery violations. That motion was denied. Well, but that's not compelled. I mean, as a trial judge, that's kind of a last resort. The remedy generally is to allow additional time for either party to prepare for whatever the new evidence is. And I submit that the record reflects that the Court said, we're going to August 12th grudgingly, then the calendar got in the way, we're going to August 26th grudgingly, don't even bother. But as a trial judge, if you come down to drop-dead day, and the defense is telling you, Your Honor, despite our best efforts, we're still not ready, that position is rethought. The defense was telling the trial judge we're not ready, and the trial judge did nothing. Not on the day of trial and not at the pretrial. There's no record that when the drop-dead date came on August 26th that there was any notification to the trial judge that the defendant would not be able to present his case. I can't imagine that a judge would, in the light of that, say you can't have a conclusion. In the transcript, there's even discussion about giving the prosecutor an oral report of the expert's results because the defense wasn't ready. Yes, there are numerous references. On the 26th? On the 29th, I believe. On the 29th. There are numerous references to the fact that the defense counsel isn't ready. Okay. Now, I also have a jury misconduct issue that I'd love to discuss. I also have four minutes, so I don't know what the Court wants me to do. How did you get these affidavits from the jurors? Well, somebody. Where did they come from? The Juice Ferry? Who brought them? How did they get in the record, too? The defense counsel and the defense counsel's investigators. There's no question that they're authentic. And that – yeah. I'm sorry. What – what I'm trying to understand. Well, I'm just curious about how you can impeach this verdict with these affidavits from jurors about who said what and so on. Well, we have two theories on that, basically. And one of them is so extensively briefed, I'll just mention it, and that's the theory that there was extrinsic evidence brought in by this juror, specifically the reference to the type of person Mr. Coleman was, his influence over Shamika Perry, the murder rate in Oakland, and how it's necessary to jail Mr. Coleman in order to protect Oakland. All of that is extrinsic evidence brought in by this juror. Beyond that, there is significant evidence that this juror was actually biased. Some of that evidence is admissible under the rule 606b because it doesn't occur during the jury's deliberations and it doesn't deal with issues that the juries were deliberating. That's the statement she makes about the type of person Mr. Coleman is and that she's sure he's a drug dealer and the necessity of cleaning up Oakland. There's also a comment made about her absolute belief in police officers' veracity and her comment that she couldn't be persuaded to vote to acquit no matter what was shown to her. Those are evidence of significant bias. Ginsburg. Is that evidence admissible, that she said she couldn't be persuaded to vote to acquit even? Is that admissible? No. But it may not be under 606b, but that's not the question. The question is what is enough to trigger the court to make the answer. That's the question for us, because we can't consider it if it's not admissible. You can't consider it to impeach the verdict, but you can consider it to order a remand so that the defense can present evidence that is admissible. Your – this circuit has a case called United States v. Henley. It's 228. Don't worry about your time. We'll be able to discuss it. Okay. 228 Fed 3rd 1111, in which the court holds that, first of all, evidence of certain kinds of juror bias isn't even governed by Rule 606b. Second of all, the question that is suggested by that case and other cases and by our brief is not whether the evidence of bias is per se admissible even if you apply the rule, but what triggers the court to bring the juror in for an inquiry. Had the court looked at these affidavits and said, my gosh, this rule, which is designed to protect the integrity of the jury system by removing undue pressures on jurors, they don't want to be William Penn's jury, they don't want to be impeached for having acquitted, they don't want to have their verdict questioned. That's why the rule is there. It's a longstanding one. What the judge should do is realize that there are other influences that can buffalo a jury into doing the wrong thing and that this influence may have been done here. And the way to inquire into it is to give the lawyers a chance to question the juror. Did you lie on Vardir when you said that you could be fair even if the witnesses were cops? Are you a member of some committee of vigilance in your neighborhood? Perhaps the defense could have investigated that and brought it in. There surely was enough to trigger an inquiry. Your case law says the inquiry is triggered on a plausible showing. It doesn't say it's true. It has to be admissible. We can't get it not on affidavits that go into the jury's mental direct impressions. That is for impeaching the verdict. That's not what you're asking us to do. No. I'm asking you to hold the ---- in this instance, yes, I'm asking you to reverse because there is evidence admissible under 606b. Yes, I'm asking you to reverse because the Henley case suggests that 606b doesn't even apply to certain kinds of bias. But also, I'm asking you to remand to make the judge do what she should have done, which is to have an evidentiary hearing at which evidence which is admissible under 606b could have been elicited. And you're saying you're asking us to use inadmissible evidence to ask the judge to get admissible evidence, and that doesn't sound right to me. Well, it doesn't sound right to me that a verdict which is plainly questionable as a violation of the most fundamental of jury guarantees by a biased juror who appears to have lied on voir dire, because I'm sure she was asked if she could be fair with police witnesses, and I'm sure she said she could be, and who then goes and apparently says that she believes police officers no matter what they say, it surely is not the case that this rule was designed to subvert the constitutional guarantee of a jury trial. But the problem is that you have to first get admissible evidence to even get to the point where you want it to be. If you could just encourage – if you could use inadmissible evidence, then the rule would have no effect. Regardless of the benign motive that you have for using it, we still are bound by the rule. I always wanted to be an appellate justice, so I will go and – or judge. What authority does Your Honor have for that proposition? There is no case that holds that you have to have admissible evidence to trigger the inquiry. The rule says – the rule says that you cannot consider those affidavits. If the rule says those affidavits are not admissible, then how do you get to the information that's there? This is – I'll try to make the point, and I hope I make myself clear, because I'm pretty sure I'm right. It is not admissible to impeach the verdict. You can't bring on a statement made during deliberations. I'm not saying that in order to impeach the verdict, but you can bring forward evidence to the judge to trigger an inquiry at which legitimate questions can be asked. For what purpose? To impeach the verdict. The bottom line is you're seeking to impeach the verdict. And you can't do it by bringing in nothing more than statements from jurors about what happened during deliberations. But there are many ways in which this juror, Ms. Lawrence, could have been examined without violating 606b. But the problem is, in order for you to get there, you have to give us admissible evidence to use for you to challenge the jury's verdict in the first instance. I don't – Because you don't – you don't ask the judge to question a juror unless you have some admissible evidence, right? Well, you can't impeach – I don't know that. Okay. What's your case, Authority, for the proposition that you can use inadmissible jury affidavits to prompt a voir dire of the jury? Henley. How do you spell that? It's H-E-N-L-E-Y. I can give you the site. And what that case says – Was that cited in your brief? I don't think so. But I'm happy to give you the site. It's a Ninth Circuit case. It's from 2000, I believe 2001, I think. I – That doesn't help us very much now if we don't have the case to look at. Well, okay. I mean, I can tell you the case citation. I believe it is – oh, gosh. It's – I'm looking at the fine law version of this, and it doesn't have the citation. It's 238 or 228, Fed Third 1111. 238 Fed Third? Yeah, or 228. I certainly – if this is of consummate importance, I can certainly give the Court the citation. What this case is, is there are some jurors who are writing to court in a carpool, and one of them makes a racist remark. The court holds – and this circuit doesn't appear to question that the racist remark would not be admissible under 606B, but it still says that the court should have conducted an inquiry into whether the juror was a racist. So that's my case for that. My other authority for it is Rule 606B. It says that you can't set aside the verdict itself on the basis of inadmissible evidence. It doesn't say you can't make further inquiry. After all, if during a trial a juror were to come forward and say everything that's said in these affidavits, the judge would have had a duty to inquire. If after trial on habeas corpus somebody comes forward and says these things, the court would probably have to issue an order to show cause and evidence be taken. The question is, when it happens in this little middle period after the jury is deliberated a motion to a new trial, does this rule somehow shield a corrupt verdict from constitutional scrutiny, and I say no. It couldn't do so constitutionally. It would subvert the jury system. It would violate confrontation. We understand your argument, counsel. Let's hear from the government, and then we'll give you a couple of minutes for our audience. Okay. Thank you very much. May it please the court, I'm Amber Rosen, representing the United States in this matter. Defendant was convicted by a jury of being a felon in possession of a firearm based on his being seen by two officers placing an object on the ground in front of him within seconds of the officers hearing gunshots. It turns out upon inspecting that object that was in front of Mr. Coleman, it was literally a smoking gun. He now claims, among other issues, that his conviction should be reversed due to discovery violations and juror misconduct, and I will address those claims in turn. Did you try this case? I did not. Do you know how the affidavits got in this record? Do I know? I think that's what I know. We do it in our record. That's what I want to know. I don't know. I would have thought you would have asked the lawyer that tried the case as soon as you saw him. Well, I think they were filed as attachments to the defendant's motion for new trial after the verdict, that he filed formants after the verdict, and they were included as attachments to that motion. And not struck, just left in there. And they were not struck, although the Court did find that at least as to most, if not all of the statements within the affidavits, that they were inadmissible under 606b. Perhaps I should start with that issue, since we're talking about it already. Defendant attempts to impeach the verdict, as Your Honors have taken note of, with four juror declarations that were submitted to the Court approximately four months after the verdict. The Supreme Court has held that allegations of juror misconduct raised for the first time days, weeks, or months after the verdict, quote, seriously disrupt the finality of the process, and that's the Tanner case. And it's for this reason that 606b provides such a strong prohibition against allowing jurors to impeach their own verdict. And under 606b, there's only two types of things that are even admissible to impeach a verdict. One is whether extraneous prejudicial information was brought to the juror's attention, and whether outside, improper outside influences were brought to bear on their decision. Otherwise, any matters or statements occurring to deliberations are not admissible. And it's for this reason that it's necessary to parse out all of the statements that defendant claims impeaches the verdict in this case. And as I said, most, if not all of them, are inadmissible. For example, just lumping together a whole bunch of them, that the foreperson said she, upon starting deliberations, that she knew defendant was guilty and she wouldn't change her mind, that she believed the police officers wouldn't lie, that she thought defendant should be convicted to clean up the neighborhood, that she thought the defendant had exploited his witness, Shamika Perry, that she tried to allegedly intimidate another juror, that she refused to deliberate on the second days, none of those relate to any kind of extrinsic evidence or information that wasn't part of the trial. None of that refers to any outside influence, and none of those can be considered by the district court and were not considered by the district court, and none of those can be considered by this Court for the reasons this Court's already acknowledged. Counsel, what's your response to opposing counsel's argument that he's not trying to impeach the verdict, he's just trying to get a hearing on whether or not this juror was impermissibly biased from the outset? Well, I believe, as this Court pointed out, one, I haven't read the Henley case. It wasn't in the briefs, and so I'm not particularly familiar with that off the top of my head. But I think this Court is right. The defense can't bring in inadmissible evidence for the Court to consider, for really any purpose. They're inadmissible. Moreover, it really is just allowing the defense to go on some kind of fishing expedition and to encourage them to go and harass or confront jurors after the trial in an effort to disrupt the very finality of the process that the Tanner, that the Supreme Court said in Tanner, should be discouraged. And so I think it's – there's no case that supports that. 606B doesn't indicate that, and there's strong policy reasons to prevent that. Moreover, I think the only statements that are even arguably extrinsic were the defendant's – the juror's statement that she was familiar with the defendant's Oakland neighborhood, and therefore, she believed he was – must be a drug dealer, and the murder rate in Oakland. Now, it's our contention, and we don't go back on this, that that is also not admissible under 606B, that that does not constitute prejudicial extrinsic information, because her personal familiarity with the neighborhood a juror is allowed to rely on sort of just their common experience, and her opinion that he was a drug dealer based on that is simply that. It's her opinion. It's not based on any actual knowledge of the defendant. Moreover, what the murder rate was in Oakland, I think in some sense that there's a high murder rate in Oakland. That's pretty common knowledge among people who live in the Bay Area. It's almost akin to saying housing prices are high in the Bay Area. I mean, it's a fact of pretty common knowledge and experience to people who live here. But even putting that aside, even assuming those statements are admissible, I think the district court was right in finding that there's no reasonable possibility that they could have affected the verdict, and I give you six reasons why that's so. The first is the Mills case. In that case, one of the jurors had seen the defendant prior to the trial. The defendant in that case was charged with distributing marijuana, and she told the other jurors that when she saw him, he looked like a fat old pot-smoking hippie. The court said no reasonable possibility of prejudice in that case, based on the fact that, one, it was only her opinion. Well, in this case, the juror's statement that the defendant was a drug dealer can't be classified as anything more than speculation on his opinion, because she didn't have any actual knowledge of the defendant, unlike the juror in Mills, who in fact had at least seen the defendant. Moreover, the court said, well, that statement didn't come in, the juror didn't make that statement until after the jury had already received all of the evidence instructions in this case, so the timing of it mitigated any prejudicial effect. That's the same situation in terms of the timing that we have in this case. The court also recognized in that case that the other jurors had told that juror that that was improper and they shouldn't consider that. Now, although 606B would appear to prevent effects of the statements on jurors as coming in, this Court has explicitly held in Mills that a court may consider other jurors' reactions to the extrinsic evidence, and they rely on Jeffries for that, so they specifically said that those kinds of statements can be considered by the court, although they're not controlling. So it's not improper that the district court looked at that in this case or that the Mills court did that. The second reason is the Grottemeyer case. In that case, the juror, the defendant was convicted of raping his neighbor. And the juror had said, based on my expert medical training, I think the defendant is mentally ill. I think he committed the crime because of his mental illness, and I know that as part of sentencing, he will receive mental health treatment. Now, I think it's pretty clear that in that case, the potential for prejudice and improper influence is even greater, because the juror was doing it based on her expert knowledge, and still the court said, no, a juror's past personal experience is an appropriate part of deliberations. And that was reiterating something in Hard v. Burlington, where they said, we expect that jurors will bring their life experiences to bear on the facts in this case. If a juror's expert medical knowledge saying that the defendant, why the defendant committed the crime, and that she knows this, is not considered to cause reasonable possibility of prejudice, then I don't think the juror's statement in this case that she thinks the defendant is a drug dealer or that the streets need to be cleaned up can be considered as prejudicial either. In addition, there's the timing of the statements. I briefly talked about that. They came in after the evidence and instructions, and even after the statements were made, the jury indicated to the judge that they were not unanimous. And it was only after readback of the officer's testimony that they then came back with a unanimous verdict. So that would suggest that the statements did not particularly sway any jurors, since they still came back hung even after having the, quote, benefit of Juror Lawrence's opinions. There's also no direct, for a fifth reason, there's no direct relationship between the statements and the charges. He wasn't charged with drug dealing. Mr. Coleman wasn't charged with any kind of violent, murderous offense. So even if those statements come in, they don't, they're not particularly relevant to whether or not he possessed the gun on the night in question. And finally, the jurors asking for readback of the officer's testimony indicates that they were properly focused on the evidence at trial, and the Clay, this Court in Clay, relied on those kinds of factors to look at what the jury actually considered to determine whether they were prejudiced or not. So for those six reasons, I think that any claim of extrinsic evidence shouldn't be considered by this Court or would be needing a remand or retrial. In terms of the juror bias, I just want to make one really quick point, or two. The first is that this issue was not raised below and really should not be considered by this Court, and if considered, only for plain error. And that is because if you look at the defendant's papers to the district court, there's no mention of juror bias whatsoever in the opening motion. And in the reply motion, bias is still not raised as an independent basis. She does mention the Dean case, but that's only in the context of raising her juror intimidation claim. And she even says on page 11 of that reply motion that the bases for the juror misconduct are extrinsic evidence, intimidation, and refusal to deliberate. There's no mention of bias, and the district court didn't rule on bias, and the defense has never asked for the court to reconsider any of its ruling on the new trial motion on the basis of bias. And then, just secondly, as this Court's already pointed out, whatever evidence of supposed bias there is about the police officers and all of that, none of that's admissible under 606B for the reasons I've already discussed. And the Grottemeyer case has explicitly held that jurors are entitled to form opinions about the witnesses and parties before them, and that's really all that Juror Lawrence did. Let me move on, then, if there's no questions about that, to the discovery. Although, I did want to make one comment about the district court, the standard that the district court applied, because the Court may recall in the brief that the defendant is claiming that the district court applied the wrong standard to the extrinsic evidence. One, this Court has made clear in Keating that even when the district court applies the wrong standard, which it did in that case, it did not apply reasonable possibility, this Court can correct that error by applying the wrong standard. And the right standard. I'm sorry? By applying the correct standard. Yes. I'm sorry. Did I misspeak? And it specifically held because our review is an independent one, we are free to engage in that analysis. So that's not a problem. And as I the defendant also points out that the Court considered the juror reactions to juror Lawrence's statements, and under Mills, that is, in fact, a proper consideration. So I will now move on to the discovery issues. Again, as this Court's already acknowledged, the really relevant question is not whether the government turned over things too late, but given that everything was turned over, was the defendant prejudiced by the timing of it, or did they get enough time to adequately prepare their defense? Counsel, why would the prosecution turn over an illegible copy of the report? Well, one, I don't think that the government knew or either – I don't know whether it was that they didn't know or whether they didn't believe that it was illegible. It's not true that the government conceded that it was illegible. They turned over the copies that they had, and perhaps they didn't take a careful look at them as they should have. I don't know. But then the defense asked for more legible copies, and so different copies were sent over to accommodate that request. How long did it take to do that? The request for the illegible copies came – For illegible copies? For legible copies, yes. On July 16th, and that request was responded to by July 23rd. Let me say, I have – I don't agree with defense counsel's characterization of the timeline and – or – and I do think that there were some factual misstatements with respect to that. And I certainly don't agree with the characterization that the government was somehow intentionally retaining these things or trying to sandbag the defense. But I think we really do need to focus on whether the defense got adequate time to prepare. And so without going into that, although I'm happy to if the Court would like me to. Well, it does seem a little – that does seem a long time to get copies. Okay. I mean, if you just have to send things through a Xerox machine and get them over, it does seem like a long time. Well, let me review the timeline then. Hoffstaff's stuff was originally provided back in December of 2001. And there was additional stuff that was provided with respect to her stuff, and it wasn't until June of 2002. But that wasn't a problem for the defense. That was not. Because her – yeah, her expert opinion helped instead of hurt. So there was no reason for the defense to make any waves regarding that. The defense was hoping this would just go through to trial. Right. So – And during a lot of that time, there were pretrial motions pending, like a major suppression motion. And so the government hadn't started its intense pretrial preparation during all of that time until that motion was resolved. And that's part of why there was just so much time there. Do you think the government didn't realize that its expert was really helping the defense? No. I think your characterization may be somewhat true, which is to say that once it turned out that the evidence wasn't going to be very compelling, a second expert was called in part to do further testing and to see if more evidence could be found, which would be more helpful to the government. I think one thing to keep in mind is it's not true to say that this – that the second expert or the defense expert's information was exculpatory. It's also not fair to say, though, that any of the evidence was particularly inculpatory. One thing all three experts basically agreed on was this kind of testing can only tell you so much. No matter how many particles you find, you're not going to be able to say the defendant fired the gun. And any absence of particles, you're not going to be able to say he definitely did not fire the gun. There's many, many factors which go into it, and this kind of evidence can only tend to corroborate or discredit the particular story being told. Now, in terms of the Dowell reports, the government notified the defense on June 24th that they were going to get a second expert. That expert did the testing on June 27th, and the result of his testing, the initial report, the result of his testing was turned over the next day on June 28th. Then on July 16th, there's the request for more legible copies as well as some other things. And all of those things, including the legible copies and whatever other protocol discovery was requested, was then turned over on July 23rd. So it may be that the government was gathering some of this other evidence to turn it all over together. I'm not exactly sure about that. It may be in the declaration that the trial attorney filed explaining all of this, which is in the record. Then on July 10th, the continuance was granted at the defense request for more time to prepare until August 12th. On July 23rd, this is now the date that the defense has everything, indisputably everything about the GSR testing has been turned over by this date. The trial is continued to August 26th at the defense request. Interestingly, if you look at the stipulation where the trial court granted the request and excluded time in the speedy trial act, and that is Exhibit P, I'm sorry, it's not in the excerpts, to the government's opposition to the new trial motion. The basis that the defense puts in there for the basis for the request is not more time to prepare based on the expert testimony, but, quote, a personal emergency. So the July 10th continuance was the last continuance request based on time to prepare. And as this Court pointed out, there were no more – there were no further requests for continuance. And I disagree with the defendant, defense counsel. I don't think there's much indication in the record to support the contention that any further request would be futile. He didn't point specifically to any pages in the record. I don't know where he's talking about. To the extent that there may be some indication of hesitation or disfavorment of granting further continuance, I think this Court is right that the onus was on the defense to say, no, we still don't have enough time, the circumstances have changed, and to give the Court at least the opportunity to determine whether then further continuance is necessary or not. Then I also think some of the delay is on the defense. The second expert's reports are illegible copies, legible copies, everything, provided by July 23rd. But then the defendant said they had to get funding for the test. Yes. But if you look at the defense counsel's, defense expert's own affidavit, which is in tab 100, exhibit G, he says that when he this, that on July 10th, okay, July 10th, so two weeks before that, this was after the initial disclosure of the Dowell report, which was June 28th, but before additional copies came, he told orally defense counsel that he thought he should do some additional testing. She then, defense counsel, doesn't even request funding until August 3rd. And there's absolutely no explanation given as for why there's an almost one-month delay between her expert saying, I think I should do additional testing in light of the doubt, the second, the government's second expert test, and her request for funding. So some of that delay needs to be put squarely at the feet of defense counsel. Moreover, putting all that aside, was the defendant prejudiced by the inability to put this evidence in? And I think that's a resounding no, again, for six reasons, and I'll go through them briefly. One is, had an entire month to prepare still, and so the inability to put it in isn't the government's fault. Two, well, that's really a subset of one, the time to prepare. So let me go on to three. Never sought a continuance. Never asked for further time. Never sought to reopen the case once the test results were back, as they came back the same day as the last day of trial. Never sought continuance. Never sought to reopen the case. And so that onus needs to be put on the defendant. Four, the evidence was really cumulative, of evidence that was already in there. This evidence, as defense counsel explained, was I shot the gun while wearing a shirt. I then left the shirt on for an hour and did normal activities, and I still had a lot of gunshot residue on the shirt. Well, the government's expert had testified that you can launder a shirt and particles will still adhere. So I don't think there's much question that you can wear a shirt for an hour and particles might still adhere. Two, the government's own expert testified, I would have expected to see more particles if he had fired the gun. So already from the government's expert, they had that kind of argument to make. More of the evidence was not very probative. All the experts agreed this evidence can only tell you so much. It can't completely inculpate or completely exculpate anyone. There were very many environmental factors that differed between the way the expert fired the gun and the defendant, which could account for some of that discrepancy. For example, the expert was at the range, indoors. The defendant was outdoors. The expert shot the gun with the gun straight out in front of him while stationary. We don't know. The defendant may very well have been running up the street. The expert used his right hand. The defendant was left-handed. Weather, different ammunition, all of these factors which were brought out during the cross-examination shows that even had this evidence come in, it would not have been very probative in determining whether the absence of particles on the defendant's shirt meant that he didn't fire the gun. And finally, the sixth reason is that the defense was able to effectively cross-examine the government's experts. As I said, they – one of them said they would have expected to see more. Both of them agreed that the evidence didn't mean that the defendant unnecessarily fired the gun, that it could have come from contamination or from being near someone else, and that they would have expected to see more residue. And the – one of the government's experts even conceded that the fact that he was an ironworker could account for those particles. So I think for all of those reasons, the admission of the testimony would not – the exclusion of the evidence that the defendant is talking about wouldn't have made any difference in the verdict. All right, counsel, thank you. Your time has expired. Thank you.  We'll give you three minutes for rebuttal, counsel. Okay. Thank you very much. I'll be in three minutes. Did you put three minutes on the clock, please? Pardon me? I was talking to the clerk. I asked her to put three minutes on the clock. Oh, okay. Thank you. I think she's already put seven. Okay. Okay. First, again, quoting from him. Three minutes with the green light. Sorry. All right. Ah. There we go. She had most of it. All right. There we go. Again, quoting from him. And then I'm going to quote from the second one. Where an awkward privilege showed there was a substantial likelihood a criminal defendant was prejudiced by the influence of racial bias in the jury room to ignore the evidence might very well offend fundamental fairness. While we find persuasive those cases that have exempted evidence of racial prejudice from Rule 606B's jury incompetency doctrine, we need not decide today whether or not or what extent the rule prohibits juror testimony concerning racist statements made during deliberations or, in this case, outside of deliberations but during the course of the trial. That's the flavor of that case. But let's go to the cases I cited in the brief. A court confronted with even a colorable claim of juror bias must undertake an investigation of the relevant facts. That's Dyer v. Calderon, 151 Fed 3rd at 974. Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury. Smith v. Phillips, 455 U.S. at 215. Thus, even absent a request by parties to question jurors and even absent a court's failure, sua sponte, to question a biased juror, the accused is still entitled to an evidentiary hearing on remand. Fields v. Woodford, 309 Fed 3rd, 1095 at 1106. That last is not a quote from the case. That's a quote from me, but it summarizes the case. So that's my argument in terms of the bias. In terms of the intrinsic versus extrinsic evidence, I think that we've basically rebutted most of what the government has said in its brief. I would just indicate that, once again, these statements by this juror were not supported by any evidence. That's what makes them extrinsic. That doesn't save them from review. And the fact is, is that they did have a direct bearing on the case because they Now, let me turn briefly to the discovery issues. Basically, the term legible versus illegible is derived not so much from our briefs as from the government's statement in its own declaration, which appears at tab 114, page 2, and that's when they refer at the very bottom to giving, quotes, legible copies of printouts. That's 723.02. Now, that's the government's own word. Okay? The other thing is that the discovery was not complete by July. It's 811.02, two-page report, further statement by SFPD, Chins, Ray, the gunshot test of defendant, including statements made by the defendant in his attempt to resist testing. That's why the shirt is relevant. That's why that second test firing is relevant, because the government's argument was, well, you didn't test a shirt in which you were squirming around for an hour in it. That was the cross-examination. And the cross-examination was telling because it didn't duplicate the circumstances of the case at bar. What the government is doing is attempting to conceal that from you. This was exculpatory evidence. This tended to acquit. Yes, the government's gunshot residue evidence was comparatively weak, but the evidence that was received after the verdict was comparatively strong. And, yes, it is true that we didn't – that the defendant did not make a final motion to continue. We've raised that as an ineffective assistance of counsel argument. Counsel was ineffective here because not – was not given an opportunity to prepare. It's ineffectiveness by proxy, and the proxy is the government's proxy. Counsel, your time has expired, but I want to ask you a couple questions. Yes. Do you – Do I get an answer? You said issue with the government's position that the juror bias issue was not raised in the district court. Yes, I do. First of all, I just quoted from my brief – I'm not going to open it again – saying that it's the court's obligation. It's the court's obligation to preserve a fair jury. Right, but I'm asking you, did the defense raise the issue, setting aside your view that it's the court's obligation to correspond to ensure that there's a fair jury, did the defense raise this issue to the district court? I hate to do this. Yes and no. But the yes part of it is, is that the defense submitted affidavits tending to show bias, and that triggers the court's obligation. Okay, then my question is, did the defense specifically raise as an issue juror bias? I don't think so. Okay. And do you take issue with the government's representation that the continuance that was requested was requested for personal emergency as opposed to prepare the defense? I can get an answer if I knew which one they were talking about. There were several requests. What are we talking about? The last one. Hold on a second. Do you know? Give me the pen. It's not in the excerpts. It's Exhibit P to the government's opposition to the new charge. If you don't know, that's fine. If you don't know, that's fine. I didn't bring it. And what's your response to the government's representation that the expert indicated earlier that more testing needed to be done? Well, maybe, but he didn't indicate what testing needed to be done. He couldn't know specifically what testing needed to be done until he got that report from them. Okay. All right. I understand. I understand your argument. Thanks. Thank you to both counsel. The case just argued and submitted, and this court is in recess until 9 a.m. tomorrow morning.
judges: Goodwin, Reavley , Rawlinson